IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| R. ALEXANDER ACOSTA,<br>Secretary of Labor, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: RDB-15-3315 |
| CHIMES DISTRICT OF<br>COLUMBIA, INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

## **MEMORANDUM OPINION**

The United States Secretary of Labor ("the Secretary")[1] brought a ten-count Amended

Complaint against eleven Defendants—Chimes D.C., Inc. Health & Welfare Plan (the "Plan")

and its alleged fiduciaries and service providers, including Chimes District of Columbia, Inc.

("Chimes DC"); Chimes International, Ltd. ("Chimes International"); FCE Benefit

Administrators, Inc. ("FCE"); Gary Beckman ("Beckman"); Stephen Porter ("Porter"); Martin

Lampner ("Lampner"); Albert Bussone ("Bussone"); Benefits Consulting Group ("BCG");

Jeffrey Ramsey ("Ramsey"); and Marilyn Ward ("Ward")—alleging violations of the Employee

Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, *et seq.*

(First Am. Compl., p. 1-2, ECF No. 102.) The Secretary contends that the Defendants charged

---

[1]　The Complaint was initially brought by former Secretary of Labor, Thomas E. Perez, who was then
replaced with former Acting Secretary Edward C. Hugler. The docket has now been updated to name the
current Secretary of Labor, R. Alexander Acosta as Plaintiff. The substitution was approved on June 6, 2018
(ECF No. 361).

the Plan excessive fees for services and engaged in prohibited transactions by receiving commissions, kickbacks, and inappropriate reimbursements.

Defendants BCG, Ramsey, Bussone, and Lampner were granted summary judgment, and Defendants Ward, FCE, Porter, and Beckman settled. The Chimes Defendants[2] proceeded to an eleven-day bench trial on the remaining five counts.

For the reasons set forth below, this Court concludes as follows:

- The Chimes Defendants took reasonable measures to oversee and monitor the Plan and its service providers, and they made reasoned decisions that were consistent with that of a prudent person acting in a like capacity in similar circumstances.

- Chimes DC's agreements with FCE and BCG were for the provision of necessary services to the Plan, for which they were paid reasonable compensation.

- The Chimes Defendants did not engage in prohibited transactions when the Chimes Foundation, which is not a party to this litigation, received charitable contributions from FCE, BCG, and their principals.

- The Plan's fees in the aggregate were reasonable, so there is no evidence of loss to the Plan.

- Regardless whether FCE committed a fiduciary breach by its collection of commissions and fees, Chimes DC was not aware that such monies were not paid into the Plan and did not knowingly participate in any misconduct.

- There was no evidence of denied benefit claims that were not afforded a proper review.

- Judgment shall be entered in favor of the Chimes Defendants under Rule 58 of the Federal Rules of Civil Procedure.

---

[2] Chimes DC and Chimes International are collectively referred to herein as the Chimes Defendants. However, this Court notes that the Plan is joined as a Defendant under Fed. R. Civ. P. 19 (a) to assure that complete relief can be granted.

The Court now issues this Memorandum Opinion as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.[3] The Court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

## BACKGROUND

### I. Chimes History

The Chimes companies ("Chimes") began as the School of the Chimes in 1947 in Baltimore, offering a special education day school for children with intellectual developmental disabilities. *See Chimes History*, https://chimes.org/about/history/ (last visited: February 14, 2019.) It expanded to provide adult programs, and by 1971, provided a 36-bed Hill-Burton[4] funded residential program, the first community alternative to institutional care for the disabled in the state of Maryland. (Perl Dep., GX[5] 201, at 8-9.)[6] In 1974, the name was changed to The Chimes, Inc. (*Id.* at 9.) The company grew in response to the changing needs of the people it was serving, developing a network of group homes, apartments, independent

---

[3]    "In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." Fed. R. Civ. P. 52(a)(1).

[4]    The Hill-Burton Act, 42 U.S.C. § 291 *et seq.*, is a government program that awarded funds to hospitals servicing uninsured or indigent patients. *See Iredell Memorial Hosp., Inc. v. Schweiker*, 699 F.2d 196, (4th Cir. 1983).

[5]    Exhibits introduced into evidence during the trial are referenced herein as GX (Government Exhibit), DX (Defendants' Exhibit), JX (Joint Exhibit) or CX (Court Exhibit).

[6]    Terry Perl worked for the Chimes companies for over forty years, serving as President and CEO of Chimes International and its various subsidiaries and related organizations from 1991 until his retirement on December 31, 2010, after which he served as president emeritus until 2016. (Perl Dep., GX 201, at 6, 8, 14.) After Perl retired, he was replaced by Martin Lampner. (*Id.* at 15-16.)

living, a full range of day habilitation, vocational, and employment programs, and a network of clinical services. (*Id.*)

In 1986, Chimes embarked on a strategic plan to diversify its revenue source as well as geographically. (*Id.* at 10). As a result, Chimes developed a vocational and office center in Baltimore County, Maryland in 1989, expanding and growing its services. (*Id.* at 10-11.) Chimes Israel was created as a not-for-profit organization in Tel Aviv, Israel, and Chimes Metro, Inc. d/b/a Chimes Delaware became a community-based services provider in Delaware. (*Id.* at 11-12.) In 1991, Chimes International was established as an umbrella organization to provide services to the other companies. (*Id.* at 17.) Around that same time, Chimes Foundation was also established as the fund-raising arm of the Chimes companies. (*Id.* at 17-18.) Chimes Foundation became the mechanism for charitable support and for advocacy for not only the Chimes companies but also for people with disabilities. (*Id.* at 18.)

Chimes also moved into a new business line, becoming certified as a vocational center under National Industries for the Severely Handicapped ("NISH")[7]. (*Id.* at 11-12.) NISH is the central nonprofit agency coordinating the participation of other nonprofit organizations participating in a government contracting program established by the Javits-Wagner-O'Day Act ("JWOD"), 41 U.S.C. §§ 8501 *et seq.*, "to promote 'employment and training opportunities for persons who are blind or have other severe disabilities.'" *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 271 (4th Cir. 2014) (quoting 41 C.F.R. § 51–1.1(a)). "To qualify for participation in the program, a nonprofit must certify, on an annual basis, that it 'employs

---

[7]     NISH is now known as SourceAmerica. (ECF No. 550 at 53; ECF No. 555 at 40.)

blind or other severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or provision of the products and services.'" *Id.* (quoting 41 U.S.C. § 8501(6)(C)). The JWOD program was renamed AbilityOne in 2006. *See AbilityOne Program – History Timeline*, https://www.abilityone.gov/abilityone_program/ history.html (last visited February 6, 2019).

In 1993, the first contract was obtained in the District of Columbia (D.C.), and Chimes DC was created as the employment entity for that contract and to serve as the employment arm for government contracting. (Perl Dep., GX 201, at 12, 18.) The contract was successful, more contracts were obtained, and the business grew. (*Id.* at 12-13.) Chimes became the largest contractor employing people to provide janitorial and maintenance services under JWOD/AbilityOne to government facilities[8] in D.C. (*Id.* at 13.) Perl testified that at the height of Chimes work during his term, there were nearly 1,500 people with disabilities and approximately 1,900 employees at Chimes DC. (*Id.*) By the time Perl retired in December 2010, the Chimes Family of Services comprised Chimes DSNJ in New Jersey; Holcomb Behavioral Health Systems in Pennsylvania and Delaware; The Chimes, Inc., d/b/a/ Chimes Maryland; Chimes DC; Chimes Virginia; Chimes International; Chimes Foundation; and Chimes Israel. (*Id.* at 16.)

Currently, Chimes DC is a certified federal contractor, managing federal, state, and local government contracts to provide primarily janitorial and custodial services at various

---

[8]     Each facility represented a separate contract. (Perl Dep., ECF No. 201, at 17.) By December 2010, Chimes had approximately 34 contracts. (*Id.* at 13, 17.)

government sites pursuant to the McNamara-O'Hara Service Contract Act of 1965, 41 U.S.C. § 6701, *et seq.*, and the Javits-Wagner-O'Day Act, 41 U.S.C. § 46, *et seq.*

## II.      The Chimes Plan

In 1993, when Chimes DC was created as the employment entity for the first contract, Chimes also established the first Chimes D.C. Health and Welfare Plan.  (Perl Dep., GX 201, at 21.)  Since Chimes DC was providing services by contract to the government, it was subject to the rules and regulations of the McNamara–O'Hara Service Contract Act of 1965, codified at 41 U.S.C. §§ 6701–6707 ("Service Contract Act" or "SCA").  (Perl Dep., GX 201, at 21-22; *see also* Trial Tr.,[9] ECF No. 546 at 83-84.)  Under the Service Contract Act, the Secretary of Labor makes determinations of the minimum monetary wages and fringe benefits for the various classes of service employees working under the contracts that the Act covers.  41 U.S.C. § 6707.  Chimes DC had the option of paying the fringe benefits portion of the wages as cash or by providing meaningful health and welfare benefits to the employees.  (Perl Dep., GX 201, at 22; 29 C.F.R. §§ 4.170(b), 4.171.)  Chimes DC elected to pay the fringe benefit amounts into a trust pursuant to a health and welfare benefit plan, rather than provide cash payouts, because of the severe disabilities many of its employees faced, which would have made it difficult, if not impossible, for them to purchase benefits in the marketplace by themselves.  (Perl Dep., GX 201, at 22.)    It also provided a tax benefit to the Chimes organization.  (*Id.*)

---

[9]      The Trial Transcript has been broken out into multiple volumes based on each day of trial and is available at ECF Nos. 546, 547, 550, 551, 554, 555, 557, 560, 562, 563, 567, 568, 570, 573, 575, 578.

Chimes DC executives felt that the company could not administer the plan by itself and chose the Boon Group ("Boon") as the Third Party Administrator ("TPA"). (*Id.* at 22-24; ECF No. 547 at 9.) The number of employees continued to grow as Chimes DC took on new contracts, in some cases assuming contracts that were under collective bargaining agreements, which required Chimes DC to work collaboratively with the unions. (Perl Dep., GX 201, at 23.) As the size and complexity of the plan increased, Chimes DC executives decided to look for a new TPA, specifically one with Service Contract Act experience that would be capable of providing a self-funded plan with coordinated stop-loss insurance[10] to reduce the exposure to catastrophic medical expenses. (*Id.* at 24-29; ECF No. 547 at 9-11.) Chimes DC was concerned that Boon was moving towards implementing a defined contribution plan, under which a monthly per-employee premiums would be paid to the insurance provider, precluding an employer from saving any money left over from the premium amount following payment of claims and benefits.[11] (Perl Dep., GX 201, at 26-27.)

In 1995, while attending a National Industries for the Severely Handicapped (NISH) conference, Perl and other executives met Jeffrey Ramsey,[12] who was promoting insurance

---

[10] Stop-loss insurance protection is typically secured by a self-insured plan to provide a ceiling on liability for very large medical claims such as cancer or an organ transplant. (Perl Dep., GX 201, at 28-29; ECF No. 555 at 10-12; ECF No. 562 at 46-47.) There are many different types of stop-loss coverage with different levels of protection, including protection against large single claims as well as for aggregated multiple claims. (*Id.*) It was important for Chimes DC to have its stop-loss protection coordinated with its primary insurance coverage to avoid potential battles between insurance companies over which one was responsible for the payment. (Perl Dep., GX 201, at 28.)

[11] Under the self-funded plan structure, an employer can amass a considerable amount of money to sustain the plan and create a surplus in the trust. (Perl Dep., GX 201 at 26-29.) Chimes DC enjoyed a favorable claims experience and, as a result, accumulated a substantial surplus of between $4 - $7.4 million during the relevant years. (Perl Dep., GX 201, at 27; JX 71 at 5.)

[12] Ramsey operated as sole owner of Benefits Consulting Group ("BCG"), an unincorporated entity. (Stip. 11, 12, ECF No. 543 at 55.)

coverage. (*Id.* at 24-25.) Ramsey introduced them to Steven Porter and Gary Beckman from FCE, who were also exhibiting at the NISH conference. (*Id.* at 25.) A separate plan was created in May 1995, BCG became the Plan's broker and plan representative, and FCE was selected as TPA for the Plan. (*Id.* at 28-29; ECF No. 547 at 6; Stip. 11, 14, ECF No. 543 at 55.) Marilyn Ward and Vivian Lewis became the Plan's co-trustees. (Stip. 17, 18, ECF No. 543 at 55.) The Plan is an employee welfare benefit plan, as defined under Section 3(1) of ERISA, 29 U.S.C. § 1002(1). (Stip. 2, ECF No. 543 at 54.) Chimes DC was the plan sponsor, plan administrator, and named fiduciary as defined by ERISA. (Stip. 5, 6, 7, ECF No. 543 at 54.) From 1995 until 2014, the Plan was self-insured for medical benefits through employer contributions paid into a trust. (JX18-40.) After 2014, in response to the impact of the Affordable Care Act ("ACA"), the Plan was self-insured for medical benefits for full-time employees, but it was fully-insured for part time employees. (JX19-24; ECF No. 547 at 3-4, 51-52.)

Through the Plan, Chimes DC was able to provide a full array of benefits to Plan participants, including: (1) medical insurance, (2) dental insurance, (3) vision insurance, (4) prescription drug coverage, and (5) life and supplemental accident insurance. (ECF No. 550 at 47-48.) Chimes DC's primary focus with respect to the Plan was to make sure it provided comprehensive benefits to its employees with disabilities. (*Id.* at 48.) Through the Plan, Chimes DC also provided benefits through a wellness program under which Plan participants were entitled to a free annual physical examination, prostate exams, pap smears, mammograms, and vaccines. (*Id.* at 48-49.) Also, because health insurance from the employer displaces the employee's Medicaid coverage where the two overlap, Chimes DC added to the

Plan a number of benefits, such as hearing aids, not covered by Medicaid, that were useful to its employees. (ECF No. 554 at 30, 72-73.)

BCG/Ramsey and FCE continued in their roles with the Plan until December 31, 2017. (Stip. 11, 12, 13, ECF No. 543 at 55.) During that time, the events at issue in this case occurred, resulting in the filing of this lawsuit in 2015.

## III. Procedural History Summary[13]

The Secretary filed a Complaint (ECF No. 1) against all Defendants but Ward on October 20, 2015. The Complaint was amended on June 7, 2016, adding Ward as a Defendant. (ECF No. 102.) The First Amended Complaint (ECF No. 102) alleged the following counts against the Chimes Defendants:

- Count I – Excessive Plan Expenses (alleged against the Chimes Defendants, Lampner, Bussone, the FCE Defendants,[14] and the BCG Defendants[15])[16]

- Count II – Chimes Defendants' Receipt of Benefits in Connection with Plan's Retention of FCE (alleged against the Chimes Defendants, Lampner, Bussone, and the FCE Defendants)

- Count III – Chimes Defendants' Receipt of Payments and Discounts from BCG and Ramsey in Connection with Plan's Retention of BCG (alleged against the Chimes Defendants, Lampner, Bussone, and the BCG Defendants)

- Count IV – FCE's Receipt of Payments from Service Providers (alleged against the FCE Defendants, the Chimes Defendants, Lampner, and Bussone)

- Count V – Failure to Prudently and Loyally Administer the Plan (alleged against the FCE Defendants and Chimes DC as Plan Administrator)

---

[13]   For a more details, see this Court's Memorandum Opinions (ECF Nos. 452, 459, 462, 487, 516).
[14]   The FCE Defendants refers to FCE, Porter, and Beckman.
[15]   The BCG Defendants refers to BCG and Ramsey.
[16]   The First Amended Complaint stated it was alleged against ALL Defendants, but the Secretary clarified that Ward was mistakenly included under Count I (ECF No. 127 at 12).

- Count VI – Plan's Reimbursements to Chimes DC for Work of Its Full-Time Employee (alleged against Chimes DC, Bussone, and FCE)

The remaining four counts were alleged against Ward as Trustee of the Plan. BCG and Ramsey filed a three-count Counterclaim (ECF No. 158), alleging violations of 12 U.S.C. § 3402-3405 based on the Secretary's failure to provide proper notice related to an administrative subpoena of bank records. The Secretary moved for dismissal, which was partially granted; Count III of the Counterclaim was dismissed on March 30, 2017. (ECF No. 184.) Summary judgment was granted to the BCG Defendants on Counts I and II on November 29, 2018. (ECF No. 457.) By the same Order, the BCG Defendants were granted summary judgment on the two counts (Counts I and III) alleged against them. (*Id.*) Defendants Lampner and Bussone were also granted summary judgment on all counts alleged against them,[17] removing them from this case. (ECF No. 488.)

Before the original Complaint was filed, the Defendants had each entered into an Agreement and Stipulation ("Tolling Agreement") with the Secretary that provided, among other things, that the "statute of limitations contained in Section 413 of ERISA, 29 U.S.C. § 1113, shall be tolled" as to the party as of the date of execution. (*See, e.g.*, ECF No. 372-3 at ¶ 2.) On June 12, 2018, Defendants filed a joint motion for partial summary judgment seeking to time-bar certain claims pursuant to ERISA's three-year statute of limitations. (ECF No. 372.) This Court held that the Secretary had actual knowledge of sufficient facts relied upon in the claims that were pleaded to trigger the limitations period and precluded the Secretary from pursuing claims related to a time period more than three years prior to each of the

---

[17] Lampner was granted summary judgment on Counts I, II, III, and IV; Bussone was granted summary judgment on Counts I, II, III, IV, and VI. (ECF No. 488.)

Defendants' respective tolling agreements. (ECF Nos. 452, 453.) As relevant to the Chimes Defendants, the Secretary is precluded from any relief that arises out of claims concerning information prior to May 23, 2011, specifically including claims concerning essential facts disclosed in the Form 5500s for the years 2007, 2008, and 2009. (*Id.*)

After the filing of the Proposed Pretrial Order (ECF No. 531) on January 3, 2019, the following Defendants settled:

- Ward by Consent Judgment (ECF No. 535) on January 7, 2019. This settlement also resulted in Counts 7-10 being dismissed.

- FCE, Porter, and Beckman by Consent Judgment (ECF No. 542) on January 10, 2019.

Remaining in this lawsuit are the Chimes Defendants. As a result of this Court's granting Chimes Motion *in Limine* to Prevent the Secretary from Offering Evidence of Payments made by the Plan to Reimburse Chimes D.C., Inc. for Work Performed by Chimes D.C., Inc. Employee Karen Holcomb (ECF No. 482), Count VI became moot. (ECF No. 524.) Accordingly, the Chimes Defendants proceeded to a bench trial on Counts I-V. The eleven-day bench trial started on Monday, January 14, 2019 and ended on Wednesday, January 30, 2019, after the testimony of 11 witnesses,[18] including 4 experts, and the introduction of more than 140 exhibits.

---

[18] Two witnesses were by video deposition. An additional six witness depositions were designated, introduced, and reviewed.

# RELEVANT FINDINGS OF FACT

## I.     The Amended Agreements

In 2002, Chimes DC and FCE entered into a new adoption agreement, which gave FCE authority to approve and deny welfare benefit claims and to establish and maintain insurance and reinsurance coverage for the Plan.  (JX52.)  Effective March 15, 2004, Chimes DC adopted the Amended and Restated Adoption Agreement for the Plan (the "Plan Agreement"), which included the Fee Schedule as Exhibit A (the "Fee Schedule") and the third party administrator agreement as Exhibit B (the "2004 TPA Agreement").  (JX 53.)

Under the 2004 TPA Agreement, Chimes DC delegated fiduciary duties to FCE, including: (1) administration of claims; (2) preparation and execution of reports and tax returns; (3) maintenance of DC's books and records for administration, as well as reporting and disclosure requirements; and (4) submission and aggregation of reports concerning paid claims. (JX53 at 29-30.)  The Summary Plan Descriptions distributed to the Chimes Plan's participants stated that the Plan is "FCE Administered" and that FCE will handle the day-to-day operations of the Plan.  (JX57 at 124, 144.)  Chimes DC also appointed Ramsey and BCG as the Plan's representative.  (JX 53 at 31-32.)

Any party could terminate the agreement for any reason or no reason upon 60 days' prior written notice. (JX 53 at 34 (Article VII(b)).)  Perl, Bussone, and Lampner all testified that Chimes DC retained the right to terminate FCE and/or BCG upon 60 days' written notice. (ECF No. 547 at 69; ECF No. 551 at 40; Perl Dep., GX 201, at 32.)

Under the 2004 Amended Trust Agreement, Chimes DC delegated fiduciary duties to the Trustees of the Plan, including: (1) controlling and managing Trust Assets; (2)

compromising, compounding, and settling any debts, obligations, and litigations; (3) making distributions to the Trust Fund; (4) "with the advance written approval of [Chimes DC]," hiring and employing agents for the administration, advice, and management necessary to carry out the Trustee's obligations under the Trust Agreement; and (5) withholding and paying any and all applicable taxes, including payroll taxes. (JX54 at 12-14; *see also* DX 173 at 11-12 (Requests Nos. 36-38); ECF No. 575 at 28.)

Under the 2004 Fee Schedule, FCE was to be paid a per-employee-per-month ("PEPM") fee for claims administration, decreasing as the number of employees in the Plan increased. (JX 53 at 23.) FCE was also to receive a percentage of the Plan's total contributions, starting at 13% and declining to 10% as the number of employees in the Plan increased. (*Id.* at 24.) BCG was to receive 7.5 percent of the Plan's total contributions. (*Id.*) The fee for Trustee services was also a percentage of total contributions to the Plan, starting at 2% and declining to 1.9% as the number of employees in the Plan increased. (*Id.*)

A disclosure in the Fee Schedule stated that FCE, and/or Porter and Beckman, "may receive commissions and/or administrative fees from insurance companies and benefit providers for services provided by FCE to this Plan. Whether any commissions and/or fees are received, as well as the actual amount received, if any[,] varies from time to time and in accordance with benefit design changes." (*Id.* at 25.) Perl, Bussone, and Lampner all testified that their understanding of the disclosure was that any rebates, discounts, commissions, and/or fees that "may" be received by FCE were to be returned to the Plan. (ECF No. 547 at 34-35, 42, 59; ECF No. 550 at 72; ECF No. 554 at 42-45; ECF No. 555 at 28; JX 67 at 4;

GX 131 at 5; Perl Dep., GX 201, at 31-32.) This Court finds their testimony to be highly credible, despite intense cross-examination by counsel for the Secretary.

Before the 2004 agreements were finalized, Chimes DC had the documents reviewed by its ERISA counsel, Smith & Downey, who suggested modifications to FCE's draft of the Plan Agreement. (*See* CX 1.) Counsel made multiple suggestions, including advice to remove a sentence providing that commissions and administrative fees be paid to the Plan's representative, and to add language that would require FCE to contribute its fees and commissions to the Plan. (*Id.*) The final version of the Plan Agreement incorporated the removal but not the addition. (*See* JX 53.) The final version of the Plan Agreement was approved, and it governed the parties' relationship until FCE's and BCG's services were terminated on December 31, 2017.

## II. Monitoring & Oversight

Since the inception of the Plan in 1993, Chimes DC has monitored the effectiveness of the TPA, regularly reviewing and evaluating options and alternatives. Boon and FCE were the two main providers having SCA experience. (ECF No. 570 at 53.) Lampner testified that as much as 90% of the employers who required specialized TPA services for the disabled worked with either Boon or FCE. (ECF No. 551 at 48-49.) Indeed, this Court specifically finds that it is undisputed that these two companies dominated the industry with respect to disabled participants. In 1995, FCE was selected to replace Boon after Chimes DC had identified issues with Boon. (Perl Dep., GX 201, at 24-29.) Chimes DC executives reasonably believed that Boon was moving away from a self-insured model, which they believed was not

in the best interests of the Plan, and they had also experienced some claims processing timeliness issues.  (*Id.*)

Chimes DC executives searched for an alternative to Boon by visiting the exhibit hall at a NISH conference, where they met, and ultimately hired, a broker for the Plan.  (*Id.* at 25.) That broker, Jeffrey Ramsey, introduced them to Steven Porter and Gary Beckman of FCE. (*Id.*)  In light of the unique circumstances of its disabled workforce, Chimes DC did not issue any Requests for Proposals ("RFPs") to other TPAs before selecting FCE to replace Boon. (ECF No. 547 at 16.)   However, this Court finds that Chimes DC engaged in an adequate investigative process, including contacting other organizations in similar circumstances and being informed that FCE was a reputable, credible, and effective health and welfare plan manager and administrator for benefits under the Service Contract Act.

Chimes DC executives continued to monitor which service providers exhibited at the annual NISH conference. (ECF No. 550 at 81-82, 94.)  They found the same reality every year: FCE and Boon dominated the market for administration of SCA-compliant benefit plans. (*Id.* at 81-82.)  They periodically spoke with similar or peer organizations to gauge whether the value they were receiving was reasonable in comparison to the fees they were paying.  (ECF No. 547 at 19-22; ECF No. 550 at 77-79.)  The evidence clearly establishes that Chimes DC offered excellent and valuable benefits to its employees.   In fact, Bussone and Lampner credibly testified that the Plan's benefits were superior to the benefits offered by the unions whose workers became employees when Chimes DC was awarded government contracts at specific sites. (ECF 550 at 68-69.)  There was absolutely no evidence to the contrary presented by the Secretary.

Chimes DC relied on its broker to monitor the TPA marketplace. As the broker, Ramsey kept tabs on the marketplace, received and reviewed proposals and marketing packages from start-up companies, assisted other service providers searching the marketplace, provided regular reports and pricing information, and presented comparison information during Plan review meetings. (ECF No. 547 at 29-31, 86-87; ECF No. 550 at 4-8, 25, 44-47, 74-75; ECF No. 551 at 27-29, 32, 44, 49, 57-58; ECF No. 554 at 31; ECF No. 555 at 30, 59-60; Perl Dep., GX 201, at 33-34; JX 84, 86.) By letter dated August 31, 2012, Bussone explicitly asked Ramsey to conduct a new comparison of the Boon and FCE plans so that "Chimes DC can make a determination of how it wishes to proceed in the future." (JX84.1; ECF No. 550 at 44.) As requested, in September 2012, Ramsey conducted the requested comparison and provided a report advising Chimes DC that the current Plan structure with FCE as TPA was better than what was being offered by Boon, confirming once again that the market had not changed. (JX67-5.)

Chimes DC executives also had discussions regarding potential TPAs with brokers that were not specializing in Service Contract Act plans. For example, in 2004, before Chimes DC signed the 2004 Plan Agreement, Ramsey contacted Kenneth Huber ("Huber") (employed by HuberOros at the time) to investigate possible alternative TPAs for the Plan. (ECF No. 562 at 9-10.) Huber testified that Ramsey was highly incentivized to find a replacement for FCE.[19] (ECF No. 562 at 41-42.) In June 2004, in coordination with Ramsey, HuberOros considered and reviewed six companies as potential TPAs for the Plan. (GX 48.3.) HuberOros and

---

[19]     Huber testified that Ramsey had expressed concern that FCE was a threat to his relationship with Chimes DC, so he hoped to find a replacement for FCE. (ECF No. 562 at 42.)

Ramsey determined that all but one of the six, CoreSource, were not viable alternatives. (GX 48.4.) Following a meeting with CoreSource in July 2004, Chimes DC decided not to further pursue CoreSource as a potential TPA for the Plan. There is no evidence that this was an unreasonable decision. Lampner testified that in June 2009, he reached out again to Huber, now of PSA Financial, regarding potential TPA alternatives, but Huber advised him that the marketplace had not changed. (ECF No. 554 at 78; JX 72 at 93; JX 73.)

Other searches for alternate TPAs also resulted in a decision that a change was not in the best interest of the Plan and its participants. (*See, e.g.*, ECF No. 551 at 34-36, 38-41.) For example, Lampner spoke with Gary Barone of RJ Prizinsky, Co. about a possible multi-employer, captive insurance structure. (*Id.* at 35, 39-41.) Chimes DC reasonably determined that this approach was too risky for the Plan. (*Id.* at 35, 39-41.)

Accordingly, Chimes DC did not send out formal, written RFPs for the purchase of TPA services. Perl, Lampner, and Bussone all credibly testified that their informal search activities were the functional equivalent given the few choices available, and they believed that sending out a formal RFP did not make practical sense. (ECF No. 550 at 103-105; ECF No. 551 at 44-46; Perl Dep., GX 201, at 104-105.) Indeed, the Secretary's expert, Andrew Naugle ("Naugle"), acknowledged that had Chimes DC issued a formal RFP, it "could have selected FCE again." (ECF No. 563 at 37.)

Chimes DC was not just a Service Contract Act employer but also a provider under the AbilityOne program, which means that the Plan's needs were unique in light of the disabilities of the Plan participants. There were additional complex issues such as the intersection between health insurance and Medicaid. (ECF No. 551 at 29-30; ECF No. 554 at 72.) A very

important consideration for Chimes DC was to not disrupt the Plan participants with a change unless it was necessary or worthwhile. (ECF No. 551 at 45-46; ECF No. 554 at 79-80.) The large majority of the Plan participants were atypical—disabled, often with mental health or intellectual disabilities, possibly unable to properly articulate issues or understand changes— so change is very disruptive for them. (*Id.*) This Court finds that these are important unique facts in this case which have never been adequately addressed by the Secretary. Consequently, Chimes DC chose to take a "best value" approach to their searches—not just looking for the cheapest price, although mindful of cost, but looking for a good fit that meets the needs and provides the best benefits. (ECF No. 550 at 62-63; ECF No. 555 at 36-37.)

Chimes DC conducted annual reviews. In late October or early November of every year, the Chimes DC Board and executives conducted an annual review of the Plan with FCE and BCG, and sometimes the Trustee, to review the Plan as a whole, including the costs and fees paid by the Plan to its service providers (the "Annual Review"). (ECF No. 547 at 3, 14, 36; ECF No. 550 at 63-66, 89-91; ECF No. 551 at 7-8; ECF No. 554 at 46, 48; ECF No. 555 at 21; JX 66, 67, 69, 71; Perl Dep., GX 201, at 71-73; GX 131; DX 44, 69, 70.) Chimes DC's and the Plan's financial statements were audited annually by an external auditing firm. (ECF No. 550 at 63; ECF No. 554 at 44, 82.)

In addition to relying upon the information reported by their service providers, the Chimes executives also relied upon the Plan's Trustee, reasonably believing that the Trustee had the duty to ensure that the fees charged to the Plan were consistent with the terms of the 2004 TPA Agreement. As agreed by the Secretary, Ward, as Trustee, had broad power and authority regarding the service providers and paying reasonable compensation for services

performed.  (DX 173 at 11-12 (Requests Nos. 36-38); ECF No. 575 at 28-37.)  Ward reported to the Chimes executives that the Plan was healthy.  (JX 67 at 3.)  Lampner testified that he understood her to report that the Plan "was fiscally sound, that there were adequate reserves to meet any expected needs, that there was good compliance, that claims were being paid in an effective manner."  (ECF No. 555 at 22.)[20]

Chimes DC also continually negotiated fees with both FCE and BCG.  In 2005, a little over a year after executing the Fee Schedule and 2004 TPA Agreement, Bussone negotiated with FCE to reduce its annual Plan Management Fee by $109,400, for each of the next two years, from January 1, 2006 through December 31, 2007, and also negotiated with BCG to reduce its annual fees by $87,000, for each of the next two years. (JX5; JX5a.)  The same reduced rate was extended after 2007.  (ECF No. 555 at 33-34.)  In September 2009, Chimes DC secured a promise from FCE and BCG to freeze their fees for another five years, from 2010-2014. (JX6; JX7.)  In November 2011, Chimes DC once again secured an agreement from FCE to freeze the then current rate structure (including the fee reductions from 2005) for an additional five-year period starting in 2015, extending the rate freeze through 2019. (ECF No. 550 at 44; ECF No. 554 at 33-34; JX72-130-134.)   In sum, Chimes DC's negotiations with FCE and BCG resulted in the annual fees charged to the Plan remaining at the 2005 level through to at least 2016.  (Perl Dep., GX 201, at 38; ECF No. 555 at 34.)

Regarding claims oversight, Chimes executives physically visited FCE's facilities in Burlingame, California, and San Antonio, Texas, on multiple occasions to review their

---

[20]     Bussone also testified that he understood the Trustee to make positive reports regarding the status of the Plan.  (ECF No. 550 at 65-66.)

operations, claims processing, and technology. (ECF No. 550 at 76-77.) At all relevant times, FCE maintained a team specifically designated to work on Chimes' Plan claims processing. (*Id.*; ECF No. 554 at 59-61; ECF No. 573 at 23-24, 28-29.) Lampner also testified to having reviewed reports of FCE's internal claims auditing process. (ECF No. 551 at 9-10.)

## III.      Corporate Structure & Governance Committee

The Chimes companies restructured during 2004 to 2005, as part of an overall policy review to implement best practices. (Perl Dep., GX 201, at 113; ECF No. 555 at 41-42; ECF No. 573 at 94-98.) Chimes DC had been a controlled entity of Chimes International, and the restructure separated the two entities. (GX 573 at 96.) One of the considerations for the change was related to the Service Contract Act and AbilityOne program requirements, which were unique to Chimes DC. (*Id.*) Chimes DC and Chimes International became separate entities, but they are related through a management agreement. (JX30; ECF No. 551 at 4; ECF No. 573 at 96.)

Under the management agreement, Chimes International provides services such as information technology support, insurance, senior leadership, bookkeeping, payroll, office space, and administrative support. (ECF No. 573 at 99-100; ECF No. 555 at 45.) Chimes DC retained management of its day-to-day operations, such as interfacing with government customers, recruiting and managing the workforce, and business development. (ECF No. 573 at 101-102; ECF No. 555 at 45.) Chimes DC has no control over Chimes International's management. (ECF No. 573 at 100.) Chimes DC approved the new set of bylaws in February 2005. (Perl Dep., GX 201, at 113; ECF No. 573 at 96.)

Chimes Foundation, which is not a defendant in this case, is a separate corporation from Chimes DC and Chimes International with its own Board of Directors and set of bylaws. (JX25; ECF No. 573 at 93.) The Chimes Foundation is a fund-raising entity dedicated to enhancing the image of the Chimes family of services. (JX25-67.) It was formed in 1991 to raise funds and make grants in support of people with disabilities. (Perl Dep., GX 201, at 17-18.) Funds raised by the Chimes Foundation are used for capital expenditures, one-time expenses such as start-up costs of new services and facilities, research projects, and support of other organizations with similar or complimentary missions. (Perl Dep., GX 201, at 51-52; ECF No. 573 at 91-93; ECF No. 555 at 40-41.) Chimes DC did not receive funds from the Chimes Foundation. (ECF No. 555 at 41.) Based on filed Form 990 information, while more than 80 percent of Chimes DC board members also sat on the Chimes Foundation board, they represented less than 50% of the Chimes Foundation's directors, so they were not in a position to control Chimes Foundation grants. (JX 25 at 148-376; DX 92 at 77-239.)

To avoid conflicts of interest in connection with donations and gifts from vendors and other third-parties, the bylaws were amended to, among other things, establish a Governance Committee, and require a Conflict of Interest Policy (the "Policy") under which Chimes DC (and other Chimes entities) would have at least four independent directors who had no conflicts of interest; and were "not affiliated with any vendors or clients of the Corporation or any of the Specified Organizations, within the meaning of the Conflict of Interest Policy set forth in the corporation's Code of Ethics, Values and Conduct." (JX 51 at 5.)

The Policy required advance approval of any transaction between a Chimes organization and a person who would be deemed a disqualified person under Section 4958 of

the Internal Revenue Code ("IRC") by "a body of directors who do not have any conflict of interest in regard to the transaction." (GX 1.1 at 4.) The Policy was reviewed annually by Chimes DC's legal counsel and updated periodically to ensure compliance with any updates to the law and to address any issues as they arose. (Perl Dep., GX 201, at 41.)

The Chimes International Governance Committee also served as the Governance Committee for Chimes DC. (ECF No. 555 at 42.) As independent directors, the members of the Governance Committee were not executives or employees of any Chimes entity, nor were they affiliated with any vendor or otherwise conflicted. (JX 51 at 5, 8.) According to the Chimes DC bylaws, the independent Governance Committee was required to approve all contractual arrangements between Chimes DC and vendors or other contracting parties identified as having possible conflicts of interest. (JX 51 at 8.) The Governance Committee maintained a single conflict log that listed all vendors of Chimes entities that had conflicts of interest under the policy, including vendors and service providers that made contributions greater than $5,000 in a given year. (Perl Dep., GX 201, at 42-43; ECF No. 551 at 15-16.) Any time Chimes DC proposed to enter into a new agreement or amended an existing agreement with a conflicted vendor, the proposal was considered by the Governance Committee. (Perl Dep., GX 201, at 39-41; ECF No. 551 at 15.) Therefore, all contracts between Chimes DC and any vendor who contributed more than $5,000 to any Chimes entity were required to be reviewed by the Governance Committee. (Perl Dep., GX 201, at 42-43; ECF No. 551 at 15-16.)

Specifically, the Policy required that the Chimes organization's Board observe as closely as possible the procedures for handling a conflicted transaction, including that only non-

conflicted directors approve the transaction, the terms of the transaction are reasonable, the directors obtain and rely on appropriate data as to comparable transactions, and the basis for the decision be documented.  (GX 1.1 at 4.)   The Board and all committees are also required to keep complete and accurate minutes of all meetings.  (JX 51 at 12.)

## IV.    Charitable Contributions

From October 26, 2007 to November 1, 2014, FCE made contributions to the Chimes Foundation totaling $476,950.  (Stip. 22; ECF No. 546 at 61.)  From September 6, 2007, to April 2, 2014, BCG made contributions to the Chimes Foundation totaling $292,500.  (Stip. 23; ECF No. 546 at 61.)   The Secretary contends that some of these contributions were made pursuant to a pledge that improperly influenced the Board to approve the retention of FCE and BCG in their respective positions.  The Secretary offered as evidence a series of emails.

On November 2, 2009, Bussone emailed Porter of FCE and Ramsey of BCG suggesting language for a letter confirming a $330,000 joint capital pledge to "the Chimes" to be paid in annual installments beginning in December 2010.[21]  (JX 9.)  The suggested language stated that $55,000 would be paid annually over five years, and then "[a]n additional $55,000.00 will be paid for a one (1) year option of continuing benefit services to our Chimes partner." (*Id.*)  Porter responded: "This works for us.  I will send you this in letter form."  (*Id.*)  Porter sent a letter dated November 2, 2009 to Perl using the pledge language that Bussone had sent to Porter by email.  (JX 74 at 7.)

---

[21]     It would take FCE and BCG six years to pay $330,000 in annual installments of $55,000.

Chimes regularly turned to its vendors, lawyers, accountants, and other suppliers to provide charitable support. (Perl Dep., GX 201, at 62.) FCE and BCG were regular annual donors, but they also made separate capital pledges from time to time. (*Id.* at 52, 59-61.) Perl emphasized that donated funds were not received by Chimes DC. (*Id.* at 52-53.) There is no evidence that the Chimes Foundation made any grants to Chimes DC during the relevant period. There is no evidence that either Bussone or Lampner received any financial benefit from FCE's or BCG's contributions to the Chimes Foundation. Further, Perl averred that any charitable contributions did not influence the decision to retain FCE and BCG. (*Id.* at 53.) He added that "it was immaterial in the context of the fact that we had the unilateral right to terminate them with 60 days' notice." (*Id.* at 59.)

Rather, Lampner and Perl testified that Chimes DC had successfully negotiated with FCE and BCG on at least four different occasions to extend their 2005 rate freeze—initially for 2 years in 2005, which was then extended to 2009, when it was again extended to 2014 with a one-year option to extend to 2015, and then again to 2019. (Perl Dep., GX 201, at 37-38, 44-47, 54-55; ECF No. 555 at 33-34; JX 73 at 1.) The November 2009 Governance Committee meeting included a report by Bussone on the options and reasons for retaining FCE and BCG. (JX 74.)[22] Perl further testified that the initial rate negotiations in 2009 occurred in June,[23] consistent with securing the TPA in sufficient time to prepare for the fall

---

[22]    Bussone was responsible for overseeing and monitoring the Chimes Plan. (JX 27 at 2; ECF No. 546 at 71, 81, 83.)

[23]    Lampner also testified that there was a June 2009 Governance Committee meeting at which a decision was made to retain FCE. (ECF No. 551 at 22-24, 26, 41.) The Secretary notes that there are no minutes of such a meeting in the record. (*See* JX 72.) It appears that there were regular meeting in May or June each year, and there are minutes of a meeting held in May 2009 at which the conflict log discussed included FCE and

open season, and when the capital pledge was made, Perl requested the letter to avoid a misinterpretation, i.e., "we wanted to be above board and clear that our business was not for sale . . . ." (Perl Dep., GX 201, at 58-63.)

This Court finds the testimony of Perl, Lampner, and Bussone to be highly credible. Taking into consideration that regular charitable contributions were made by many vendors, the independent right to terminate, the oversight of the Governance Committee, and the credible testimony of the Chimes executives, this Court finds that the retention of FCE and BCG in 2009 was not dependent on their charitable pledges.

## V. Reasonableness of Fees

### A. Total Fees

The Secretary's expert, Andrew Naugle ("Naugle"), is an expert in benchmarking, which is an analytical tool widely used in the healthcare industry to evaluate an organization's performance against a peer group. (GX 119 at 4; ECF No. 562 at 93-97.) Benchmarking is also used throughout the benefits consulting industry to assess TPA fees. (ECF No. 562 at 97-98; ECF No. 568 at 45.)

To assess the reasonableness of the Plan's fees, Naugle conducted a benchmarking analysis. (ECF No. 562 at 120.) To begin, Naugle downloaded the entirety of the Department of Labor's Form 5500 database for the years 2011 through 2015. (ECF No. 562 at 120-21, 123-24, 128.) Naugle then filtered the Form 5500 sample to select only plans that had benefit features present in the Chimes Plan. (ECF No. 562 at 123-24, 126.) To further refine the

---

Ramsey, although the minutes do not reflect a specific discussion about them. (*Id.*) There was a Chimes DC Board meeting held in June 2009. (DX 69.)

sample to include only those plans that would be like comparators to the Chimes Plan, Naugle eliminated fully insured plans and plans that offered a fully-insured option. (ECF No. 562 at 124; GX 119 at 9.) After applying these filters, Naugle found only one plan, a union plan, that matched the exact benefits provided by the Chimes Plan over the five-year period. (ECF No. 563 at 85-86; GX 119 at 7, Table 2.) Since this was not sufficient for a comparator sample, Naugle created proxy benchmarks. (ECF No. 563 at 86-87.) The resulting sample of comparator plans ranged in number from 100 to 152 plans for the five-year period. (ECF No. 562 at 128-29; GX 119, Table 4 (Sample 2a plus Sample 3).)

Using the administrative expense data reported on the sample plans' Forms 5500, Naugle identified the sample's high, median, and low administrative costs on a PEPM[24] basis. (ECF No. 562 at 127; GX 119 at 11, Table 8.) Naugle then made adjustments to his benchmarks to account for differences between the proxy benchmarks and the unique characteristics of the Chimes Plan. (ECF No. 563 at 88-90.) First, Naugle made an adjustment for the marginal labor cost incurred by the plan for Service Contract Act administrative duties. (ECF No. 562 at 128-29.) Naugle estimated that plan compliance with the SCA would require 30 minutes of added labor per-employee per-year. (ECF No. 562 at 129; GX119 at 12.) Using an assumed annual salary of $40,000, Naugle converted this estimate into a $1.50 PEPM adjustment to the low, median, and high benchmarks. (ECF No. 562 at 130; GX 119 at 12.)

Naugle also made an adjustment to attempt to account for the Plan's disabled participants. (ECF No. 563 at 2-6; GX 119 at 11-12.) He did this by assuming that 10% of

---

[24] PEPM refers to per-employee-per-month.

the Plan's participants would have utilization levels similar to a Medicare Advantage population, and the rest of the Plan's participants would be similar to a commercial large-group population.  (ECF No. 563 at 30-31; GX 119 at 12.)  This was an inherent fatal flaw in his analysis, which was of limited use to this Court.

The Plan's administrative expenses as reported on the Forms 5500 compared to Naugle's benchmarks are higher every year during the period of 2011 through 2015.  (ECF No. 563 at 7-9; GX 119 at 18, Table 13.)  Also based on Naugle's benchmarking analysis, the Plan's actual total expenses, as compiled by the Employee Benefits Security Administration ("EBSA") exceeded the high benchmark value in all years.  (ECF No. 563 at 9-11; GX 119 at 19, Table 15, Attachment I; JX 2; JX 3.)

Defendants' expert, Aaron Stewart-Raddock ("Raddock"), is an expert in Service Contract Act compliance assessment and remediation services, including auditing and forensic analysis.[25]  (ECF No. 570 at 19-22; DX 110 at 3.)  Specifically, as relevant in this case, he works with government contractors assessing employee health and welfare plans, TPA selection and compensation, the AbilityOne program, and compliance with SCA administrative burdens.  (ECF No. 570 at 22-30; DX 110 at 3.)   Raddock opined that Naugle's analysis had two significant flaws, for which he made adjustments and then recalculated the benchmark values, and separately, Raddock compared FCE's fees and the fees in aggregate to FCE's two main competitors in the SCA marketplace—Boon and the Fringe Benefit Group.  (ECF No. 570 at 48; DX 110 at 3.)

---

[25]     The Secretary objected to Raddock's methodology, but this Court ruled that he was qualified to testify as an expert on third party administrators and the reasonableness of fees for a health and welfare plan under the SCA.  (ECF No. 570 at 39-45.)

Raddock explained that the Chimes Plan is unique in its combination of SCA complexity and AbilityOne's requirement for minimum 75% disabled participant population. (ECF No. 570 at 48-54, 55-57; DX 110 at 4-6.)   Raddock noted that when Naugle searched for similar plans to evaluate for benchmarking, he found only one match to his criteria that crossed all the years in the analysis period.  (ECF No. 570 at 58-59; DX 110 at 6-7.)  Further, Naugle's criteria did not include AbilityOne status.  (DX 110 at 7.)  Very few TPAs specialize in SCA contracts because of their complexity.  Lampner testified that the SCA administrative complexity was exacerbated by the frequently changing medical conditions and other disability-related problems, which often cause the hours of Chimes DC's individual employees to fluctuate from one week to the next, and cause employees to miss substantial periods of time, or both. (ECF No. 554 at 74-75.) (ECF No. 570 at 53, 59.)  FCE and Boone are the biggest players, and recently the Fringe Benefits Group and a couple others have entered the market but typically don't provide all the same services.  (ECF No. 570 at 53.)

Raddock took a different approach from Naugle to adjust for Service Contract Act complexity.  (ECF No. 570 at 61-65; DX 110 at 8-9.)  He took FCE's primary competitor, Boon, and reviewed two proposals that provided separate quotes for administering SCA and non-SCA populations.  (ECF No. 570 at 63; DX 110 at 9, Table 3.)   The resulting adjustment for SCA complexity was 6-47% rather than Naugle's 1-9%. (ECF No. 570 at 65; DX 110 at 9, Table 4.) Raddock also took a different approach to adjusting for the disabled workforce. (ECF No. 570 at 65-67.)  Raddock used AbilityOne's 75% disability requirement to adjust for disability rather than Naugle's adjustment of 10% for "high utilizers."   (DX 110 at 10, Table 5.)  Raddock then applied his adjustments to Naugle's proxy benchmarks and compared the

total adjusted percentiles as Naugle did. (ECF No. 570 at 77-74; DX 110 at 10, Table 6.) The resulting total plan fees are between 60 and 90 percent of the range. (ECF No. 570 at 73; DX 110 at 10, Table 6.)

In addition to mimicking Naugle's benchmarking approach using adjusted factors for SCA complexity and the 75% disabled participant population, Raddock also separately compared FCE's fees to Form 5500 filings and proposals[26] from its primary competitor, Boon, and to the Fringe Benefit Group's Form 5500 filings. (ECF No. 570 at 76-77; DX 110 at 12-18.) The comparison of direct fees showed FCE's fees less on average than Boon and Fringe Benefit Group. (ECF No. 570 at 77-78; DX 110 at 13-14, Tables 10, 11.) Upon comparing both direct and indirect fees,[27] FCE's fees were less on average[28] than Boon and Fringe Benefit Group. (ECF No. 570 at 80-82; DX 110 at 17, Tables 14, 15.) Raddock concluded that FCE's fees were reasonable, and relying on Applebaum's conclusion that BCG's fees were reasonable (ECF No. 568 at 50), and Naugle's conclusion that the administrative fees for trustee services were reasonable (GX 119 at 17-18), Raddock concluded that Plan fees in the aggregate were reasonable. (ECF No. 570 at 45; DX 110 at 18.)

This Court finds both experts credible and helpful in the analysis of total Plan fees. This Court further finds that the Chimes Plan has unique requirements that make comparisons

---

[26]    Raddock received the proposals from FCE counsel and it is unknown whether any of the proposals were accepted. (ECF No. 570 at 114-15.)
[27]    After making an adjustment for FCE's indirect fees related to Marilyn Ward. (ECF No. 570 at 81; DX 110 at 15-16.) Naugle also excluded indirect payments from Ward to FCE in the EBSA analysis. (GX 119 at 17.)
[28]    Although they were higher than the proposal that was most comparable in size to the Chimes Plan. (ECF No. 570 at 117-19; DX 110 at 17, Table 14.) That company, Maximus, also selected FCE as its TPA service provider. (ECF No. 563 at 42.)

a challenging exercise. Naugle, however, did not appear to fully appreciate the implications of the Service Contract Act complexity or the 75 percent disabled participant population comprising the Chimes Plan.[29] Since few TPAs specialize in SCA contracts, it is reasonable to expect that a plan may pay more than a median rate for that expertise. Moreover, it is entirely reasonable for a company that has more than 75% of its plan participants disabled to stay with an existing TPA rather than disturb their participants with frequent changes by chasing the lowest rate possible.[30] This Court does not accept Naugle's conclusion that all amounts above the median benchmark represent losses to the Plan. Tellingly, Naugle testified that it was not an industry standard to consider everything above the median excessive, admitting "I mean, ultimately, I'm being asked to say: They spent too much." (ECF No. 567 at 36.)

Based on the testimony and evidence on the record, and in light of the Plan's unique characteristics, this Court finds that the fees paid by the Chimes Plan in the aggregate were not excessive in contrast to comparable plans. Accordingly, this Court finds that the Plan's fees were reasonable.

---

[29] The Plan's complexity increased with the introduction of the ACA requirements in 2014. (ECF No. 554 at 75-80; ECF No. 568 at 30-31.) Bussone testified that the administration of the Plan was further complicated by a number of union agreements, all of which had different health and welfare requirements. (ECF No. 550 at 68-69.)

[30] As noted by Bussone from the minutes of the November 2012 annual meeting between Chimes, FCE, and BCG: "[O]ur goal as an organization and provider of healthcare plans to people with disabilities as well as other employees, is to provide the best value in health care and not necessarily the least expensive plan." (JX 67 at 5.)

## B.    FCE Services & Fees

### 1.    TPA Fees

FCE's services as TPA were necessary for the administration of the Plan.  Naugle created stand-alone TPA fee benchmarks by extracting the TPA service fees from the Forms 5500 of his sample and adding his SCA and disabled population adjustments.  (ECF No. 563 at 16; GX 119 at 15-17.)  FCE's TPA fees listed in the Plan Agreement, when adjusted for the annual discount, were above the 80th percentile of the benchmarks in all years.  (ECF No. 563 at 18; GX 119 at 17, Table 12.)  FCE's TPA fees were lower than the highest benchmark in every year.  (GX 119 at 17, Table 12.)  Naugle reported that the Plan's actual TPA-only expenses, as shown on EBSA's summary of compensation (JX 2, JX 3, GX 119 Attachment I), exceeded the highest benchmark in all years.  (ECF No. 563 at 19; GX 119 at 20, Table 17.)

Raddock again mimicked Naugle's benchmarking but with his adjustments for the two factors, SCA complexity and the 75% disabled participant population.  (ECF No. 570 at 74; DX 110 at 11.)  Raddock notes that even including the indirect compensation paid to FCE, the adjusted percentiles are within the range in the Forms 5500 sample, and in the EBSA summary, the fees were within the range for three years and slightly above range in two years. (ECF No. 570 at 74-74; DX 110 at 11-12, Tables 8, 9.)  Raddock also notes that TPAs catering to the SCA market typically use a percentage fee structure such as FCE's, rather than a fixed PEPM structure as Naugle suggested, because it is more suitable to the Service Contract Act's characteristics and provides for more benefits for the part-time employees that the Plan is designed to cover.   (DX 110 at 12.)

Naugle opined that higher administrative expenses might be explained by an offering of a broader scope of services or higher service levels, but in his opinion, FCE offered neither. (GX 119 at 15.) However, Naugle did not appreciate the expertise that FCE had in the SCA marketplace as well as with the Chimes Plan's disabled population, the integration of computer systems between Chimes DC and FCE to minimize the re-keying of data (*see* JX 72 at 134), the perception by Chimes DC that they were receiving good service (*see id.*), and Chimes DC's desire to avoid the disruption that change causes the Plan participants—service worth paying for.

Based on the same reasoning as above finding that the total Plan fees were reasonable, this Court finds that FCE's fees, even if higher than the median, were reasonable.

## 2. Rebates & Commissions

From 2010 through 2016,[31] FCE received a total of $3,239,443 in fees and commissions from insurance companies and service providers that provided insurance or services to the Chimes Plan. (JX 2.) FCE disclosed most of the fees and commissions that it received from third parties on the Chimes Plan's Forms 5500. (JX 14-22.) Lampner signed the Chimes Plan's Forms 5500 for years 2010 through 2015. (*Id.*) FCE never paid any of its fees and commissions to the Plan, although Chimes' executives understood the agreement with FCE to be that, with one exception,[32] should FCE receive any such rebates and commissions, they would be paid into the Plan. (ECF No. 547 at 34-37, 42, 59; ECF No. 550 at 72; ECF No.

---

[31] As relevant to the Chimes Defendants, the Secretary is precluded from any relief that arises out of claims concerning information prior to May 23, 2011. (ECF Nos. 452, 453.)

[32] The only exception described was where FCE performed administrative services and earned a fee which resulted in a cost savings to the Plan. (ECF No. 547 at 34-37.)

554 at 42-45; ECF No. 555 at 28; JX 67 at 4.)  The understanding was based on multiple conversations among FCE, Chimes DC, and Ward.  (ECF No. 547 at 35-37, 42; ECF No. 550 at 72; ECF No. 554 at 42-45; ECF No. 555 at 28; JX 67; GX 131 at 5.)  Perl and Bussone testified that Porter told them that such rebates were being returned to the Plan. (Perl Dep., GX 201, at 31-32; ECF 547 at 34.)  There is no evidence on the record that any representative for FCE, BCG, or the Trustee ever indicated that they had a different understanding regarding rebates, discounts, commissions, and/or administrative fees.

In 2014, in response to the implications of the ACA, the Plan added indemnity insurance from Madison National Life Insurance Company ("MNL") for the part-time employees.  (*See* ECF No. 547 at 3-5; ECF No. 554 at 75-76; ECF No. 555 at 37-38; JX 19 at 24.)  FCE procured the MNL insurance policy for the Plan and operated as the claims administrator under the MNL insurance policy.  (ECF No. 555 at 63; JX 19 at 37; JX 33; JX 34; Faucher Dep. 93-94.)  FCE collected commissions and administrative fees from MNL in connection with the premiums that the Plan paid to MNL.  (JX 33; JX 34; Faucher Dep. 87-89.)  From 2014 through 2016, FCE collected over $1.2 million in commissions under the MNL indemnity policy in connection with premiums paid by the Chimes Plan.  (JX 2.)  The Secretary provided testimony that FCE set its own commission rates under the MNL policy, and when they increased their commissions, the premiums for the Plan increased.  (Faucher Dep. 88; Levin Dep. 100, 282.)  Whether this is accurate or not, there is no evidence presented in this case that Chimes DC was aware of FCE's collection of commissions or rebates that were not paid into the Plan.

Notably, the expert's calculations of indirect compensation included these commissions and rebates in the EBSA compensation summaries discussed above. (*See* GX 119 at 19; DX 110 at 14.) Raddock stated that such indirect compensation is common within the industry and cited examples from both Boon's and Fringe Benefits Group's proposals. (DX 110 at 14-15.) The Form 5500 refers to eligible indirect compensation, and FCE disclosed fees and commissions that it received from third parties on the Chimes Plan's Forms 5500. (GX 119 at 9; JX14-22.) Even though some of FCE's indirect compensation was not related to the Chimes Plan, taking it into account in the EBSA compensation comparison did not result in a finding that FCE's fees were excessive.

### C.    BCG Services & Fees

Ramsey was considered the Plan's broker by the Chimes executives, the Board, the Governance Committee, Chimes DC staff, external vendors, and other brokers. (*See, e.g.*, Perl Dep., GX 201, at 25-26; ECF No. 547 at 29, 75; ECF No. 550 at 67; ECF No. 551 at 27, 57; ECF No. 554 at 31; ECF No. 555 at 13, 84-85; ECF No. 557 at 14-15; ECF No. 562 at 9-10, 42; JX 73, 74.) As broker, Ramsey was relied on to regularly survey the providers in the SCA marketplace, investigate any inquiries by potential TPAs, obtain quotes and fee comparisons, research options on request, and make recommendations. (ECF No. 547 at 20, 29-30, 33, 51; ECF No. 554 at 31; ECF No. 550 at 62.)  Ramsey had experience in the SCA marketplace. (ECF No. 562 at 37-38; ECF No. 568 at 28.)  Ramsey was identified only as the Plan Representative, not as broker, in the Plan Agreement and on the Chimes Plan's Forms 5500. (JX 14 at 22, 53.) Being a Plan Representative and a benefits broker are not mutually exclusive roles (*see* ECF No. 568 at 88-89), and this Court finds that Ramsey performed both roles.

As Plan Representative, BCG/Ramsey's services included ("to the extent applicable to the Plan"):

1. Site visits to explain benefits and enroll initial participant group;

2. Facilitation of information necessary to obtain and disseminate employee ID cards;

3. Completion of New Group Information form for each covered contract site and timely updates to same reflecting changes in contribution, contact personnel, contact information and the like;

4. Periodic site revisits to repeat the benefit enrollment and presentation process due to employee and management turnover;

5. Meetings on behalf of the employer, plan, or both with government agencies, collective bargaining representatives, in-house and outside legal counsel, and the like;

6. Telephonic and personal accessibility to aid and assist employees and managers to understand and use the benefit plan;

7. Transmittal of employee communication forms and documents;

8. Interfacing between employer and plan participants to facilitate plan related communication and resolve issues;

9. Employee advocacy on claims coverage issues; and

10. General on-site trouble shooting.

(JX 53 at 31-32 (emphasis added).)   The Secretary contends that Ramsey and BCG did not fulfill all of these tasks because some were being handled by others.  For example, Karen Holcomb ("Holcomb"), a Chimes DC employee, was a point of contact for benefit questions from participants (JX 29; ECF No. 555 at 71-72; ECF No. 557 at 26); Holcomb and FCE

performed work before and during open enrollment (ECF No. 555 at 72; ECF No. 557 at 17-19); Holcomb facilitated the preparation of identification cards (ECF No. 555 at 77; ECF No. 557 at 34); and FCE prepared the Plan's Group Information Forms (ECF No. 555 at 79-80).

Holcomb testified that she relied on Ramsey (ECF No. 557 at 32-33), she called Ramsey or his staff for benefit questions that were not routine (ECF No. 557 at 26-27), he was responsive (ECF No. 557 at 39-40), and BCG was an integral part of the annual open enrollment process. (ECF No. 557 at 15-25.) Ramsey and his staff attended open enrollment every year and performed several functions both during the planning phase and during on-site visits. (ECF No. 550 at 67-68; ECF No. 555 at 25-27.) Ramsey was also involved with evaluating the implications of the ACA to the Plan. (ECF No. 557 at 44-45.) These services were necessary for the operation of the Plan.

BCG's contracted fee was 7.5% of Plan contributions, but they were reduced by $87,000 per year in 2006, representing approximately a 20% reduction at that time, and remained at the reduced rate. (JX 53; JX 5 at 7; JX 72 at 130-134; ECF No. 550 at 44; ECF No. 554 at 33-34.) Defense expert, Joseph Applebaum ("Applebaum") opined on the reasonableness of BCG's compensation. (DX 109.) Based on the Form 5500 information for the years 2011 through 2015, Appelbaum opined that BCG's compensation expressed as a percentage was "[b]etween 5.75 percent and 6.24 percent." (ECF No. 568 at 40.) Based on the EBSA's information for the years 2011 through 2015, Appelbaum opined that BCG's compensation range was 4.96 percent to 5.96 percent. (ECF No. 568 at 40.)

Appelbaum testified that (1) percentage of premium as payment to brokers is the mainstay in the industry and that he has not seen compensation on an hourly basis for brokers

(ECF No. 568 at 36-37); (2) brokers' compensation is "typically between 3 and 6 percent" and that the 3 to 6 percent range is something he has seen "thousands" of times (ECF No. 568 at 42-43); (3) this range applies to benefit brokers performing similar tasks to those rendered by BCG for Chimes DC, "with the exception that the work that BCG did was more highly specified, and it's just a different level of service, higher than the normal or typical broker does," (ECF No. 568 at 43); and (4) the fees paid by the Plan to BCG during the period 2011-2015 "are squarely within industry norms and they are reasonable." (ECF No. 568 at 50.)

The Secretary's expert, Naugle, also briefly opined on BCG's fees, although most of his report was focused on FCE fees. (GX 119.) Defendants challenged Naugle's expertise regarding the reasonableness of BCG's fees. (ECF No. 562 at 117-118.) This Court permitted Naugle to testify about BCG's fees but warned that the testimony may not be accepted due to his lack of qualifications with respect to insufficient foundation. (ECF No. 562 at 119.) Naugle admittedly had no experience with benefits brokers and performed minimal analysis using an assumed hourly rate, converting the tasks performed by BCG and Ramsey during open season enrollment into an assumed number of hours, and opining that the resulting fees were excessive. Naugle admitted that he did not account in his fee calculations for unreimbursed expenses incurred by Ramsey and other BCG staff working on Chimes behalf. (*See* ECF No. 563 at 73-76.) Naugle also did not account for the reduction of fees by $87,000 per year. (ECF No. 563 at 80.) Further, Naugle agreed with Applebaum that as a percentage, 3 to 6 percent of premiums is reasonable compensation for a benefits broker, and BCG's fees were within that range after the $87,000 per year reduction. (ECF No. 563 at 80-81.) Naugle

provided no estimate of the amount of BCG's fees that he considered excessive. (ECF No. 563 at 82.)

The Court finds Applebaum's methodology and opinion credible and rejects the approach taken by Naugle as well as his conclusions regarding BCG's fees. Accordingly, this Court finds Ramsey's fees reasonable.

## VI.     FCE Claims Administration

Under the 2004 TPA Agreement, Chimes DC delegated to FCE the authority to, among other things, administer claims for benefits, determine the entitlement to Plan benefits, approve, process and pay medical, prescription, dental, vision, short term disability, and death claims, and establish and maintain insurance and reinsurance coverage for the Chimes Plan. (JX53 at 29-30.) FCE was also responsible for deciding claims appeals. (*Id.*)

The Secretary's expert, Naugle, opined on FCE's administration and claims processing performance. (GX 119 at 22-24.) Naugle reviewed several third-party claims audit reports prepared for MNL and Standard Security Life Insurance Company as well as an action plan that FCE had provided to its customer, Maximus. (GX 119 at 22.) Starting in 2013, MNL hired Trilogy Consulting Group ("Trilogy") to conduct several FCE claims audits. (Faucher Dep. at 103-104.) Trilogy's audits show that FCE operated below industry standards for procedural and financial accuracy.[33] (GX 159 at 161.) In 2014, PPC Partner-Plus Consulting conducted an operational due diligence review of FCE's claims processing operations and determined that FCE's claims processing had operational deficiencies. (GX 25 at 12.) Naugle

---

[33]     Naugle opined that the industry standard for financial accuracy is 99 percent and for procedural accuracy is 95 percent. (GX 119 at 23.)

concluded that the quality of FCE's claims processing is below industry standards for procedural and financial accuracy and likely resulted in over- and under-payments to providers. (GX 119 at 24.) However, Naugle provided no evidence of any losses to the Plan for the alleged substandard claims processing on the part of FCE. (ECF No. 567 at 39-40.)

J. Mark Abernathy ("Abernathy") was the Defendants' expert witness providing independent analysis and expert testimony regarding FCE's claims administration process. (DX 108.)[34] Abernathy testified that Naugle failed to verify any of the third-party work product he relied upon. (ECF No. 573 at 11-13.) He testified that the Trilogy audits are misleading and based upon a methodology that is not reliable.[35] (ECF No. 573 at 14, 17-19, 28.) Importantly, Trilogy made mistakes in the way it adjudicated claims for the audits, and the audits included both Chimes and non-Chimes claims. (ECF No. 573 at 21, 23.) That is, the audits were not measuring the separate team dedicated to handling Chimes claims. (ECF No. 573 at 23-24.)

Abernathy testified that FCE's claims adjudication error rates were within the average range of other major industry leaders. (ECF No. 573 at 10-11.)[36] Abernathy also noted that FCE converted to a new claims management system during 2015, and it is normal in the industry to have minor processing issues during and post conversion. (DX 108 at 4.) Neither

---

[34] The Secretary had no objections to Abernathy's expert credentials or his methodology. (ECF No. 573 at 7.)

[35] One of the main flaws is that most of the audits were focused rather than random, so they did not represent a population of claims that allows for conclusions to be drawn. (ECF No. 573 at 13.) The Trilogy audits were also of first adjudications of claims and not the final adjudications. (ECF No. 573 at 27-28.)

[36] Abernathy noted: "I've seen some pretty bad claims operations. I've also seen some very good claims operations. And clearly FCE is neither the very good nor are they the very bad. I would say they're somewhere in between." (ECF No. 573 at 9.)

Naugle nor Abernathy reported seeing any complaints to FCE from any Chimes participants. (ECF No. 573 at 82.) Perl and Lampner testified that Chimes DC found the claims processing to be acceptable, partially based on the lack of complaints from participants. (Perl Dep., GX 201, at 140; ECF No. 555 at 56-58, 65-66.)

This Court finds that the claims accuracy was within the industry average. Further, there is no evidence that the Plan has ever failed to pay any covered claim during the relevant time period. (JX 14 at 20 (2010-2015 Form 5500s, Schedule H); ECF No. 573 at 82.) Accordingly, this Court finds that there is no evidence that the Chimes Plan's participants had claims denied without a proper review.

## CONCLUSIONS OF LAW

I.      **Count I – Excessive Plan Expenses**

The Secretary contends that the Chimes Defendants failed to properly investigate the marketplace when selecting FCE as TPA and failed to monitor FCE and BCG in the performance of their duties. By this failure, the Secretary contends that the Chimes Defendants breached their duty of loyalty and prudence under 29 U.S.C. §§ 1104 (a)(1)(A), (B), and committed prohibited transactions under §§ 1106(a)(1)(C), (D).

Plaintiffs bear the burden of proving that a fiduciary has breached a fiduciary duty and a *prima facie* showing of loss to the Plan. *Tatum v. RJR Pension Inv. Committee*, 761 F.3d 346, 356-57, 363 (4th Cir. 2014). The fiduciary defendant then bears the burden of proof on loss causation. *Id.*[37]

---

[37]     There is a circuit split on this issue, with the First, Fourth, Fifth, and Eighth Circuits holding that once a plaintiff has established a breach of fiduciary duty and loss to the plan, the burden shifts to the plan fiduciary to prove that such loss was not caused by its breach. Four circuits (the Sixth, Ninth, Tenth, and Eleventh) have

## A.    Duty of Loyalty and Prudence

The fiduciary duties under ERISA are the highest known to the law.  *Tatum*, 761 F.3d at 356.  ERISA imposes standards of fiduciary duty, including that the fiduciary "discharge his duties . . . solely in the interest of the participants and beneficiaries," and act "with the care, skill, prudence, and diligence" as would a prudent person under the same circumstances. 29 U.S.C. § 1104(a)(1).

Chimes DC was the named fiduciary and plan administrator of the Chimes Plan.  29 U.S.C. § 1102(a); *Canada Life Assur. Co. v. Estate of Lebowitz*, 185 F.3d 231, 237 (4th Cir. 1999). In 2004, Chimes DC made a proper delegation of its fiduciary duties under ERISA as follows: (1) to FCE to administer the Plan; and (2) to Ward to act as the Trustee of the Plan, in accordance with the Plan documents. (JX53 at 39-32.)  ERISA allows for a fiduciary to delegate a fiduciary duty.  *See* 29 U.S.C. § 1105(c)(1) ("The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities . . . among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities . . . under the plan.").  However, "Section 1105(c)(2) clearly provides that the delegation of a fiduciary duty does not end forever the delegating fiduciary's responsibility for ensuring that the duty is discharged."  *Willett v. Blue Cross and Blue Shield of Alabama*, 953 F.2d 1335, 1340-41 (11th Cir. 1992).

Therefore, having delegated its duties under ERISA, the Chimes Defendants retained the ongoing responsibility to monitor FCE and the Trustee.  "The scope of the duty to

reached an opposite conclusion, holding that the burden remains on the plaintiff to prove that a plan loss resulted from the alleged fiduciary breach.

monitor appointees is relatively narrow." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 312 F. Supp. 2d 1165, 1176 (D. Minn. 2004) (citing *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1466 (4th Cir. 1996)). The limited duty to monitor does not include a duty "to review all business decisions of Plan administrators" because "that standard would defeat the purpose of having trustees appointed to run a benefits plan in the first place." *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011). The Department of Labor has issued guidance in the form of an Interpretive Bulletin with the following question and answer on fiduciary responsibility under ERISA:

> Q: What are the ongoing responsibilities of a fiduciary who has appointed trustees or other fiduciaries with respect to these appointments?
>
> A: At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan. No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure.

29 C.F.R. § 2509.75–8 at FR–17.

Prudence is not measured in hindsight. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007). "[T]he prudent person standard is not concerned with results;" the proper test is not the result, but what actions and processes Chimes DC undertook at "the time of the challenged decision." *Id.* (quoting *Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 917-18 (8th Cir. 1994)). The evidence adduced at trial demonstrates that the Chimes Defendants regularly reviewed the prudence of the selection of FCE as TPA, kept tabs on the marketplace,

renegotiated fees to the Plan's benefit, held annual meetings with FCE and the Trustee, reviewed annual reports, required outside auditing of the Plan, and monitored the administrative and claims processes.

There was no evidence that the Chimes Defendants simply delegated and then "turned a blind eye" resulting in excessive Plan expenses. Certainly, ERISA does not require a fiduciary to "scour the market" to find and offer the cheapest possible deal for Plan participants. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); Department of Labor EBSA Tips.[38]  There is no requirement under the law to engage in a formal, written RFP process. *DiFelice*, 497 F.3d 414, 424; Department of Labor EBSA Tips ("You <u>may</u> want to get formal bids from those providers that seem best suited to your needs." (emphasis added)).

The Secretary contends that Chimes DC was imprudent by failing to employ any experts to assess the TPA marketplace, similar to the trustees in *Katsoras v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984).   The district court in *Katsoras* relied on expert testimony to find that the trustees "failed to observe their duty to seek outside assistance" because they were "ill-equipped to evaluate the soundness" of a proposed loan and relied exclusively on the borrower's representations when a reasonable investigation would have revealed that the loan was totally unsound. *Id.* at 279-80.  This is not an analogous situation; the Chimes' executives sought outside assistance from Ramsey, Huber, and other external sources in evaluating the marketplace.  They also consulted with other organizations for whom FCE was providing

---

[38]    *See* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/ fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (No.5 -"[P]lan fiduciaries are not always required to pick the least costly provider").

services and were informed that FCE was a credible and effective health and welfare plan manager and administrator.

The Secretary also argues that Chimes DC should not have relied on undocumented and informal information from Ramsey or Huber, citing *Brundle v. Wilmington Trust*, 241 F. Supp. 3d 610, 633 (E.D. Va. 2017). The *Brundle* court noted that a fiduciary relying on expert advice must "do at least three things: '(1) investigate the expert's qualifications, . . . (2) provide the expert with complete and accurate information, . . . and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances.'" 241 F. Supp. 3d at 633 (quoting *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996)). In this case, neither Ramsey nor Huber were considered "experts" on whom the Chimes' executives blindly relied, but rather were outside sources assisting in the overall effort to make reasoned and informed decisions.

An objective evaluation of the Chimes Defendants' conduct, compared to a prudent plan administrator under the same circumstances, results in the conclusion that they acted reasonably. The Chimes executives took reasonable measures to oversee and monitor the Plan and its service providers, and they made reasoned decisions that were consistent with that of a prudent person acting in similar circumstances.

Finally, the Secretary failed to carry his burden of making out a *prima facie* case that the Plan suffered "some sort of loss." 29 U.S.C. § 1109(a); *Tatum*, 761 F.3d at 361. The Secretary argued that all fees above the median benchmarks were excessive and, therefore, losses to the Plan, but this Court found that the evidence established that the Plan's fees were reasonable.

Without a showing of damages, the Secretary's claims fail as a matter of law. *Tatum*, 761 F.3d at 361

Accordingly, this Court holds that the Chimes Defendants did not breach their fiduciary duties of loyalty and prudence under Count I.

## B. Prohibited Transactions

Plaintiffs bear the burden of proving a prohibited transaction. *See Elmore v. Cone Mills Corp.*, 23 F.3d 855, 864 (4th Cir. 1994). To avoid liability, the defendants bear the burden of showing that the prohibited transactions fall within a statutory exception. *Id.* That is, the defendants bear the burden of showing that any proven excessive payments fall within the statutory exemption for "reasonable arrangements," 29 U.S.C. § 1108(b)(2), which requires demonstrating that the services were necessary and had an objective basis. *See* 29 C.F.R. § 2550.408b-2(a)(1)-(3).

> Except as provided in section 1108 of this title:
>
> **(1)** A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect–
>
> . . . .
>
> **(C)** furnishing of goods, services, or facilities between the plan and a party in interest;
>
> **(D)** transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

29 USCA § 1106(a).

The Secretary contends that because FCE and BCG were already service providers to the Plan, they were parties in interest (*see* 29 U.S.C. § 1002(14)(B)) when Chimes DC agreed

to continue retaining them. The payment of fees to them from the Plan thereafter then constitutes a direct or indirect transfer of plan assets to a party in interest, in violation of 29 U.S.C. § 1106(a), unless Defendants can prove that they were "reasonable arrangements" involving "services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor," 29 U.S.C. § 1108(b)(2)).

The Chimes Defendants have met the burden of showing that the statutory exemption applies regarding the payment of fees to FCE and BCG. This Court has found that FCE and BCG provided necessary services to the Plan. These services were provided pursuant to the 2004 Plan Agreement and Fee Schedule as modified to reduce or freeze fees in subsequent years. The fees to FCE, BCG, and in aggregate, were reasonable. Therefore, this Court holds that the Chimes Defendants are not liable for committing prohibited transactions under Count I.

## II.     Counts II & III – Chimes Defendants' Receipt of Benefits in Connection with Plan's Retention of FCE & BCG

The Secretary contends that by the Chimes Foundation's receipt of charitable donations from FCE and BCG while they were service providers to the Plan, the Chimes Defendants breached their duty of loyalty and prudence under 29 U.S.C. §§ 1104 (a)(1)(A), (B), and committed prohibited transactions under §§ 1106(b)(1), (b)(3).

Citing the Internal Revenue regulations governing not-for-profit entities, 26 C.F.R. § 1.414(c)-5(a)-(b) ("IRC 414"), the Secretary asserts that at the time the Chimes Foundation accepted the gifts from FCE and BCG, at least eighty percent of the directors of Chimes DC were also directors of the Chimes Foundation, which brings Chimes DC and the Chimes

Foundation under common control for purposes of plan-related matters. However, IRC 414 does not apply to prohibited transactions. IRC 414(b) specifically states that it applies "[f]or purposes of the IRC sections 401, 408(k), 408(p), 410, 411, 415 and 416..." but does not mention IRC 4975 (the code section dealing with Prohibited Transactions). This is consistent with the doctrine of *expressio unius est exclusio alterius* which instructs that where a law expressly describes specific situations to which it shall apply, what was omitted or excluded was intended to be omitted or excluded. *Reyes-Gaona v. N. Carolina Growers Ass'n, Inc.*, 250 F.3d 861, 865 (4th Cir. 2001).

A violation of § 406(b)(3) can be found without evidence of a *quid pro quo* transaction. *Brink v. DaLesio*, 496 F. Supp. 1350, 1367-68 (D. Md. 1980) *aff'd in relevant part, rev'd on other grounds*, 667 F.2d 420 (4th Cir. 1981). "[I]t is psychologically unrealistic to expect a trustee to ignore his personal interests when they are potentially at odds with his fiduciary obligations." *Id.* For this very reason, the Chimes entities established the Governance Committee and a Conflict of Interest Policy, which required advance approval of any transaction between a Chimes organization and a donor to the Chimes Foundation. FCE and BCG retention decisions were made by the Governance Committee pursuant to the Conflict of Interest Policy. The evidence does not support the Secretary's contention that the Governance Committee's decisions to continue with FCE and BCG as the Plan's TPA and Plan Representative were improperly influenced by either Chimes DC's executives or the Chimes Foundation.

This Court found that the charitable donations made to Chimes Foundation did not benefit Chimes DC, and Chimes DC's board was not in a position to influence the Chimes

Foundation's decisions on the use of funds donated to it. The Chimes Foundation is a separate legal entity from Chimes DC and is not its alter ego. *See Maryland Elec. Indus. Health Fund v. Masters Elec., Inc.*, No. WDQ-14-3849, 2016 WL 164301, at *4 (D. Md. January 13, 2016) (*citing Alkire v. NLRB*, 716 F.2d 1014, 1019-20 (4th Cir. 1983)). Therefore, the charitable contributions were not consideration to Chimes DC for its own personal account, so the contributions were not prohibited transactions (or "kickbacks") under Section 406(b)(3) of ERISA. 29 U.S.C. § 1106(b)(3). Also, neither payment nor receipt of the contributions was dealing with Plan assets by Chimes DC or FCE in their own interest or for their own accounts or in exchange for a guarantee to FCE or BCG for continued service, so the contributions were not prohibited transactions under Section 406(b)(1) of ERISA. 29 U.S.C. § 1106(b)(1).

The Chimes Defendants did not engage in prohibited transactions when the Chimes Foundation received charitable contributions from FCE, BCG, and their principals. Accordingly, this Court holds that the Chimes Defendants are not liable under Counts II and III.

III.     **Count IV – FCE's Receipt of Payments from Service Providers**

The Secretary contends that the Chimes Defendants breached their duty of loyalty and prudence under 29 U.S.C. §§ 1104 (a)(1)(A) and (B) by permitting FCE, another fiduciary, to engage in prohibited self-dealing by collecting over $3.2 million in impermissible fees and commissions from third parties dealing with the Chimes Plan. There is no statutory exception to the prohibition on fiduciary self-dealing. *See Nat'l Sec. Systems v. Iola*, 700 F.3d 65, 94-95 (3d Cir. 2012). Under Count IV, the Secretary is contending that the Chimes Defendants committed a fiduciary breach by allowing another fiduciary (FCE) to engage in prohibited self-

dealing through the receipt of impermissible fees and commissions. In essence, this requires a finding of co-fiduciary liability.

ERISA provides that one fiduciary may be liable for breaches of fiduciary duty committed by another fiduciary under specified circumstances: (1) if the co-fiduciary knowingly participates in or tries to conceal the primary fiduciary's breach of duty; (2) if the co-fiduciary, by failing to comply with his, her, or its own fiduciary duties, enables the primary fiduciary to commit a breach of duty; or (3) if the co-fiduciary knows of a breach of duty by the primary fiduciary and fails to make reasonable efforts to remedy it. 29 U.S.C. §§1105(a)(1)– (3).

In this case, this Court found no evidence that Chimes DC was aware of FCE's collection of commissions or rebates that were not paid into the Plan. Further, this Court found that FCE's fees, including indirect compensation, were reasonable, and the Plan's fees in aggregate were reasonable. Without a showing of damages, the Secretary's claims fail as a matter of law. *Tatum*, 761 F.3d at 361; *Carr v. Int'l Game Tech.*, 770 F. Supp. 2d 1080, 1096-97 (D. Nev. 2011).

Regardless whether FCE breached its fiduciary duty, the Chimes Defendants would not be found to have knowingly participated in or enabled any misconduct. Accordingly, this Court holds that the Chimes Defendants are not liable under Count IV.

## IV.       Count V – Failure to Prudently and Loyally Administer the Plan

The Secretary contends that Chimes DC, as Plan Administrator, failed to afford reasonable review of denied claims with safeguards. ERISA requires benefit plans covered by the Act to provide internal dispute resolution procedures for participants whose claims for

49

benefits have been denied. 29 U.S.C. § 1133. Specifically, plans must provide adequate, written notice of specific reasons for denial and afford participants a reasonable opportunity for a "full and fair review" of the decision denying the claim. *Id.* "Congress' apparent intent in mandating these internal claims procedures was to minimize the number of frivolous ERISA lawsuits; promote the consistent treatment of benefit claims; provide a nonadversarial dispute resolution process; and decrease the cost and time of claims settlement." *Makar v. Health Care Corp. of Mid-Atlantic (CareFirst)*, 872 F.2d 80, 83 (4th Cir. 1989).

This Court found that there was no evidence of specific complaints related to claims much less evidence of denied claims that were not afforded a proper review. Nor was there evidence of any losses to the Plan resulting from the alleged substandard claims procedures on the part of FCE. This Court found that the claims accuracy was within the industry average. Therefore, this Court holds that Chimes DC is not liable under Count V.

## CONCLUSION

For the foregoing reasons:

1. Judgment shall be entered in favor of Chimes D.C., Inc. Health & Welfare Plan, Chimes District of Columbia, Inc., and Chimes International, Ltd. on Counts I, II, III, and IV of the First Amended Complaint (ECF No. 102), and against R. Alexander Acosta, Secretary of Labor, with costs.

2. Judgment shall be entered in favor of Chimes District of Columbia, Inc., on Count V of the First Amended Complaint (ECF No. 102), and against R. Alexander Acosta, Secretary of Labor, with costs.

A separate order follows.

Dated: February 26, 2019.

_____/s/_____
Richard D. Bennett
United States District Judge